**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**CHARLES EVERETT MASHAW, JR.,**

                                        **Plaintiff,**

          **vs.**                                    **5:13-CV-0802**
                                                     **(LEK/CFH)**

**CAROLYN W. COLVIN**
**Commissioner of Social Security,**

                                        **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

Olinsky Law Group                         Howard D. Olinsky, Esq.
One Park Place
300 South State Street, Suite 420
Syracuse, New York 13202
_Attorney for Plaintiff_

Social Security Administration            Vernon Norwood, Esq.
Office of General Counsel                 Special Asst. U.S. Attorney
26 Federal Plaza, Rm. 3904
New York, NY 10278
_Attorney for Defendant_

**Christian F. Hummel, U.S. Magistrate Judge:**

## REPORT-RECOMMENDATION AND ORDER[1]

## INTRODUCTION

     Plaintiff Charles Everett Mashaw, Jr., brings the above-captioned action pursuant to 42

U.S.C. § 405(g) seeking a review of the decision from the Commissioner of Social Security

("Commissioner") that denied his application for disability insurance benefits ("DIB").

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

## PROCEDURAL BACKGROUND

On October 28, 2009, plaintiff filed an application for DIB. (T. 164-68)[2]. Plaintiff was 39

years old at the time of the applications with prior work experience as a baker, cook and laborer.

(T. 22, 201). Plaintiff claimed that he became unable to work beginning on July 15, 2005, due to

a traumatic brain injury/brain disorder. (T. 200). On February 10, 2010, plaintiff's application

was denied and plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), which was

held on October 12, 2011. Plaintiff appeared with an attorney. On November 21, 2011, the ALJ

issued a decision denying plaintiff's claim for benefits. (T. 13-23). The Appeals Council denied

plaintiff's review on May 14, 2013, making the ALJ's decision the final determination of the

Commissioner. (T. 1-6). This action followed.

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to

individuals with "disabilities." The Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A).

There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is
> not working, (2) that he has a 'severe impairment,' (3) that the
> impairment is not one [listed in Appendix 1 of the regulations] that
> conclusively requires a determination of disability, and (4) that the
> claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type
> of work the claimant can do." The claimant bears the burden of proof
> on the first four steps, while the Social Security Administration bears
> the burden on the last step.

---

[2]"(T.)" refers to pages of the Administrative Transcript, Dkt. No. 9.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the onset date, July 15, 2005. (T. 15). At step two, the ALJ concluded that plaintiff suffers from the following severe impairments: mild degenerative joint disease of both knees, obesity, history of traumatic brain injury, affective disorder and alcohol abuse and dependency. (T. 15). At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the Listing of Impairments. The ALJ then found that plaintiff had the Residual Functional Capacity ("RFC") to "perform light work as defined in 20 CFR 404.1567(b) except that he [is] limited to work that consists of routine, simple tasks and which does not require complex decisionmaking [sic] or frequent contact with others". (T. 16). At step four, the ALJ concluded that plaintiff could not perform his past relevant work. (T. 22). At step five, relying on the medical-vocational guidelines set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T.

22).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the

Social Security Act.  (T.23).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1)

the RFC is not supported by substantial evidence because the ALJ did not apply the treating

physician rule in his assessment of Dr. Adekola Alao's opinions; (2) the ALJ failed to follow the

Regulations and improperly found plaintiff "not credible"; and (3) the ALJ erred when she failed

to retain a vocational expert to testify. (Dkt. No. 11).

## I.    RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT AND THE MEDICAL OPINION EVIDENCE

Residual functional capacity is:

> "what an individual can still do despite his or her limitations....
> Ordinarily, RFC is the individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion
> of the individual's abilities on that basis. A 'regular and continuing
> basis' means 8 hours a day, for 5 days a week, or an equivalent work
> schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96  8p, Policy Interpretation Ruling

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96  8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)). In making the RFC determination, the ALJ must

consider a claimant's physical abilities, mental abilities, symptomology, including pain and other

limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R.

§ 404.1545(a).  The ALJ must consider all the relevant evidence, including medical opinions and

facts, physical and mental abilities, non-severe impairments, and plaintiff's subjective evidence of

symptoms. 20 C.F.R. §§ 404.1545(b)-(e).

The Second Circuit has defined a treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coty v. Sullivan*, 793 F.Supp. 83, 85 86 (S.D.N.Y.1992) (quoting *Schisler v. Bowen*, 851 F.2d 43 (2d Cir.1988)). Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78 79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 501, 503 504 (2d Cir.1998).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *See Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. §

404.1527(d)(2)).  "Similarly, treating source opinion can be rejected for lack of underlying expertise, or when it is brief, conclusory and unsupported by clinical findings, or when it appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy is reasonably suspected."  *Orts v. Astrue*, 2012 WL 6803588, at *5 (N.D.N.Y. 2012) (citations omitted).  "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence."  *See Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009).

Pursuant to 20 C.F.R. § 404.1527(1), every medical opinion, regardless of its source, must be evaluated.  However, the treating physician rule does not apply to consulting doctors. *See Jones v. Shalala*, 900 F.Supp. 663, 669 (S.D.N.Y. 1995); *see also Limpert v. Apfel*, 1998 WL 812569, at *6 (E.D.N.Y.1998).   An ALJ may rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." *Williams v. Astrue*, 2011 WL 831426, at *11 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513(C), 404.1527(f)(2), 416.912(b)(6), 416.913, and 416.927(f)(2).  The weight afforded a consultative opinion depends upon the thoroughness of the underlying medical examination and the degree of light the opinion sheds on the conflicting assessment of the treating physician. *Gray v. Astrue*, 2009 WL 790942, at *10  11 (N.D.N.Y. 2009) (citation omitted). While an ALJ must give "good reasons" if he does not give a treating physician's opinion sufficient weight, there is no similar requirement for consulting physicians. *Id*. (citing *Limpert*, 1998 WL 812569, at *6).  If an ALJ relies upon a non-examining reviewer's opinion, that opinion must be supported by the bulk of the record. *See* Social Security Ruling

("SSR") 96 6p, 1996 WL374180, *2 (July 1996); *see also Rocchio v. Astrue*, 2010 WL 5563842, at *14 (S.D.N.Y. 2010).

Plaintiff asserts that the RFC assessment is not supported by substantial evidence because the ALJ failed to properly apply the Regulations in her evaluation of Dr. Alao's opinions. The Commissioner disagrees and argues that the ALJ considered Dr. Alao's "overly restrictive opinion" and afforded it little weight as it was inconsistent with the weight of the evidence.

**A.      Medical Evidence**

On April 17, 2008, the Department of Veterans' Affairs issued a Decision finding that plaintiff was entitled to individual unemployability, effective May 11, 2005 and Dependents' Educational Assistance from May 2006. The decision was based upon a June 2006 examination and behavioral health records from March 2007 and April 2008. (T. 300).

In January 2010, plaintiff began receiving mental health and behavioral health services at the Bath Veterans' Administration Medical Center ("VA"). Plaintiff participated in group therapy with various social workers, received individual substance abuse therapy and had weekly individual therapy sessions with clinical psychologist, Ellen Dougherty, Ph.D. Plaintiff appeared on January 7, 2010, January 14, 2010, January 21, 2010, January 28, 2010 and February 12, 2010 for the above mentioned therapy. (T. 499-505).

On January 5, 2010, plaintiff was evaluated by Kristen Barry, Ph.D., at the request of the agency. At the time of the evaluation, plaintiff lived with his girlfriend and two teenage children. Plaintiff provided a history of suffering a traumatic injury due to an assault in 1990 that left him in a coma. Plaintiff stated that he was in a custody battle for his children with his ex-wife and reported a history of anger issues. Plaintiff denied current alcohol or drug use but admitted to heavy use in the past and two admissions for rehabilitation. Plaintiff was arrested for four

different instances of "DWI" and stated that he was on probation until 2011. Upon examination, plaintiff's speech was fluent and clear, his thoughts were coherent and goal oriented, and his affect was full and appropriate. Plaintiff's mood was "somewhat helpless" and his attention and memory were intact. Plaintiff's judgment was noted as "fair". With respect to daily activities, plaintiff was able to cook, clean, do laundry, shop and manage his own funds. Plaintiff did not socialize with friends or family and his hobbies included poker and computers. Dr. Barry opined that plaintiff was able to follow and understand simple instructions and maintain attention fairly well. Plaintiff was noted as "a fairly intelligent individual" but has difficulty with stress and making appropriate decisions due to that stress. Dr. Barry diagnosed plaintiff with alcohol dependence and depressive disorder. (T. 265).

On March 4, 2010, plaintiff's attending psychiatrist, Adekola Alao, completed an "attending note". Dr. Alao noted that plaintiff, a 39-year old Army veteran, suffered a traumatic brain injury in 1990 resulting in personality changes and impulse control issues. Plaintiff was not, at the time of the note, taking his medications. Plaintiff was incarcerated for violating parole for drinking alcohol. Dr. Alao described plaintiff as depressed, unmotivated, stressed and angry. Plaintiff also discussed issues with his teenage daughter involving child protective services. Upon examination, Dr. Alao noted that plaintiff was irritable but maintained good eye contact, spontaneous speech with normal volume and tone and organized thought processes. Plaintiff's thoughts were devoid of any suicidal or homicidal tendencies. Plaintiff denied experiencing hallucinations and his memory/concentration was fair. (T. 494). Dr. Alao diagnosed plaintiff with mood disorder secondary to medical and suggested that plaintiff start Celexa and renew his

prescription for Levitra.[3] Dr. Alao discussed possible side effects of the medications and plaintiff was told to contact the doctor with worsening symptoms of if he experienced suicidal or homicidal tendencies.

On March 18, 2010, Dr. Alao completed another attending note. Plaintiff reported that his girlfriend ended their relationship. At the time, plaintiff was taking his previously prescribed medication. Dr. Alao's assessment of plaintiff's speech, thoughts, ideals, and concentration was unchanged from the assessment two weeks prior. Plaintiff was directed to return in two weeks. (T. 492). On the same day, Dr. Alao completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (T. 698). Dr. Alao noted that plaintiff sustained a traumatic brain injury resulting in short term memory loss and personality changes. The doctor opined that plaintiff had moderate restrictions in: understanding, remembering and carrying out simple instructions; interacting appropriately with the public and marked limitations interacting with supervisors and co-workers. The doctor also opined that plaintiff suffered from "extreme" limitations in the following areas: the ability to make judgments on simple and complex work-related decisions; understanding and remembering complex instructions; carrying out complex instructions; and responding to usual work situations and change in a routine work setting. The doctor also stated that plaintiff has "extreme suspicion about others". The doctor noted that plaintiff could not manage his own best interests. The doctor was asked to give an opinion on whether plaintiff's impairments include alcohol/substance abuse and to explain if that impairment contributed to plaintiff's limitations. The doctor answered, "[n]ot applicable. Patient was not using alcohol or substance abuse prior to the injury". (T. 700).

---

[3] Celexa is a preparation of citalopram hydrobromide indicated for the treatment of depression. Levitra is administered orally for the treatment of erectile dysfunction. RxList, Celexa, Levitra, http:// www.rxlist.com. (last visited July 3, 2014).

From March 2010 through May 2010, plaintiff continued to participate in group therapy, individual substance abuse therapy and consistently attended individual therapy with Ellen Dougherty. On May 13, 2010, Dr. Alao re-evaluated plaintiff. Plaintiff advised that he attempted to commit suicide by intentionally abusing his medication and combining his prescription with alcohol. Plaintiff stated that he attempted to overdose because his girlfriend terminated their relationship. Upon examination, Dr. Alao noted that plaintiff was lethargic and his speech was "slurred". Plaintiff maintained minimal eye contact with reduced volume of speech. His thoughts were organized and he denied any further suicide plan. (T. 481). Dr. Alao sent plaintiff to the emergency department for blood work to assess the impact of the overdose. Plaintiff followed with several therapists and medical providers on the same day. All providers suggested voluntary admission to the VA but plaintiff declined fearing that he would be unable to cope without his "social supports". Dr. Alao was consulted in this regard and opined that plaintiff had no suicidal or homicidal ideation and did not need to be admitted. (T. 472). A prevention plan was initiated involving plaintiff's new girlfriend. On May 14, 2014, Dr. Alao spoke with plaintiff and was told that plaintiff was with his girlfriend and "felt safe". Dr. Alao noted that she would see plaintiff "next week". (T. 470).

In June 2010, plaintiff was incarcerated for violating the conditions of his parole when he was found to be intoxicated by his parole officer. Plaintiff received therapy while incarcerated at the Syracuse Justice Center.

Plaintiff continued to participate in therapy with a psychologist and substance abuse counselor at the VA until February 2011 due to his incarceration. (T. 702). In December 2011, plaintiff reinitiated contact with his providers at the VA and was given an appointment for January 19, 2012 to restart his medication.

**B.     Analysis**

In her decision, the ALJ discussed Dr. Alao's medical source statement and assigned the opinions "little weight":

> Dr. Alao's opinion is not consistent with the longitudinal record as described above.  As noted above, the record indicates that the claimant retains sufficient cognitive capabilities that a finding of "extreme" limitations in the relevant areas is not supported.  Furthermore, Dr. Alao wrote that substance abuse is "Not applicable" as the claimant was not using alcohol or other substances prior to his traumatic brain injury in 1990.  Although Dr. Alao's statement may be accurate with respect to the circumstances of his injury, it fails to properly consider the role of alcohol or other substances with respect to the claimant's present condition. (T. 20).

The "longitudinal" record that the ALJ referred to includes plaintiff's records from the VA and objective testing which the ALJ concluded supports "a finding of moderate functional limitations".  The ALJ cited the following:

> Objective mental status testing reports consistently indicate that the claimant is fully oriented and alert without evidence of psychosis, hallucinations, or delusions.  There is no evidence of a formal thought disorder or abnormal thought process.  The claimant's capacities for concentration, memory, and attention are generally intact. (Exhibits 1F, 9F-11F, 14F).  Records of group therapy indicate that the claimant participates appropriately and fully interacts with his therapist and other group members. (9F).  He is generally assessed with a Global Assessment of Functioning (GAF) score in the range of 50 to 60 (Exhibits 9F and 14F), consistent with a finding of only moderate symptoms and functional limitations. (T. 18).

Upon review of the entire record, the Court finds that the ALJ properly applied the Regulations, considered Dr. Alao's opinion, and provided adequate explanations and reasoning for assigning the opinion "little weight".  An ALJ is required to consider a treating physician's opinion but if the ALJ decides not to assign substantial weight to that opinion, the ALJ must explain the rationale for failing to do so.  Here, the ALJ clearly considered Dr. Alao's opinion and

provided an explanation, with citations to objective medical evidence that contradicts Dr. Alao's opinion regarding extreme limitations. Plaintiff disagrees and cites to various reports from nurses, social workers and therapists associated with the VA that he claims provide substantial support Dr. Alao's assessment. The Court has reviewed the record but is not persuaded by plaintiff's argument. The medical sources cited by plaintiff were not treating sources and, moreover, they did not render opinions with regard to plaintiff's ability to perform work-related functions. Indeed, the only other MSS on record was completed by Dr. Barry and Dr. Barry's opinions do not mirror Dr. Alao's extreme restrictions. To the extent that plaintiff relies upon the 2008 Decision from the Department of Veterans' Affairs as support for Dr. Alao's opinions, plaintiff's argument is misguided. That decision was rendered more than two years prior to Dr. Alao's opinion and was based upon treatment rendered in 2006 and 2007.

Furthermore, despite plaintiff's arguments, the Court is not convinced that Dr. Alao was a "treating physician" as defined by the Regulations. Dr. Alao examined plaintiff on only two occasions prior to completing the MSS. The record does not contain clear evidence of the type of ongoing medical treatment that would define Dr. Alao as a "treating physician". *See George v. Bowen*, 692 F.Supp. 215, 219 (S.D.N.Y. 1988) (holding that the nature of the physician's relationship with the plaintiff did not rise to the level of a treating physician as the physician had only seen the plaintiff on two occasions). Even assuming Dr. Alao was a treating physician, the extreme limitations are not supported by the doctor's own treatment notes. During both examinations, Dr. Alao noted that plaintiff maintained good eye contact, spontaneous speech with normal volume and tone and organized thought processes. Dr. Alao directed plaintiff to return or call only if he experienced side effects from the medications or worsening symptoms. To the extent the opinions expressed in the MSS differ from the medical record, indicating restrictions

12

that were far more severe than those which would be supported by the evidence, the opinions were properly discredited. "When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling." *See Snell v, Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Dumas v. Comm'r of Soc. Sec.*, 2008 WL 4104685, at *4 (E.D.N.Y. 2008) (holding that the ALJ did not err in refusing to give great weight to the opinions of the plaintiff's treating physicians because their opinions indicated that the plaintiff's abilities were much more limited and restricted than the opinions of other medical consultants and inconsistent with bulk of the plaintiff's medical records). The Court finds no error in the ALJ's assessment of Dr. Alao's opinion.[4]

## II.    CREDIBILITY

Plaintiff claims that the ALJ failed to apply the appropriate legal standards in assessing her credibility. "The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective

---

[4] Plaintiff does not present any other objection or argument regarding the ALJ's evaluation of the medical opinion evidence or the weight assigned thereto.

findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her symptoms are consistent with the objective medical and other evidence. *See* SSR 96 7p, 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96 7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon v. Astrue*, 781 F.Supp.2d 92, 105 (N.D.N.Y. 2011) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and his own activities during the relevant period. *Howe Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y. 2007). The ALJ must also consider whether "good reasons" exist for failing to follow the prescribed treatment, e.g. religious objections, lack of ability to pay, significant risks associated with treatment. SSR 82 59; *see also Grubb v. Apfel*, 2003 WL 23009266, at *4 *8 (S.D.N.Y. 2003). The ALJ determines issues of credibility and great deference is given his judgment. *Gernavage v. Shalala*, 882 F.Supp. 1413, 1419, n. 6 (S.D.N.Y. 1995).

Here, the ALJ concluded that plaintiff's statements regarding the limiting effects of his symptoms are "not credible to the extent that they are inconsistent with the [ ] residual functional

capacity assessment." (T. 17). The ALJ summarized the objective medical evidence and concluded that the record did not support plaintiff's statements concerning his limitations. Moreover, the ALJ discussed plaintiff's activities of daily living, including playing computer games, using Facebook and playing the "occasional game of basketball" and concluded that these hobbies are "inconsistent with substantial limitations". (T. 19). The ALJ also discussed plaintiff's inconsistent hearing testimony:

> There is a serious inconsistency between the claimant's testimony and the record regarding the circumstances of his termination from his last job. At the hearing, the claimant asserted that he stopped working at Dunkin Donuts because his position was eliminated. On the contrary, the claimant told his psychologist that he "left the job after an altercation with a co-worker".

The ALJ discussed plaintiff's inconsistent medical treatment:

> The claimant has received limited and inconsistent treatment for both his mental and physical issues. Although the claimant testified that his condition has recently worsened, he is not currently undergoing any therapy and is not on any medication for depressions. Furthermore, the claimant has resumed drinking despite evidence showing that he is making progress while sober. (T. 20).

Finally, the ALJ commented on her own observations of plaintiff during the hearing and mentioned plaintiff's poor work record, alcohol use and multiple incarcerations in the context of the credibility analysis. (T. 20).

Plaintiff argues that the ALJ improperly assessed plaintiff's credibility in two respects: (1) the ALJ erroneously mischaracterized plaintiff's testimony regarding his termination from employment as "inconsistent"; and (2) the ALJ failed to consider plaintiff's recent release from prison as a reason for his lapse in medical treatment at the VA. (Dkt. No. 11, p. 19).

**A.      Inconsistent Statements Regarding Work History**

During the hearing, the ALJ asked plaintiff about his job at Dunkin Donuts:

Q.     How long did you work there?

A.     Ten months maybe.

Q.     How come the job ended?

A.     They told me that they basically did away with my position. There's, was other workers there who could do what I do and still work at the front.

Q.     Do you think they were telling you the truth or do you think there was some other reason?

A.     I imagine that that had a lot to do with it because when you're running a restaurant business you want to worry about all your labor costs and everything. So I am sure that had a lot to do with it. The fact that I couldn't work up from or wasn't allowed or whatever, it just made me just disposable. (T. 33).

Plaintiff also admitted that he was not permitted to work "up front" or with the public because he was "very outspoken" and "just had no tolerance". (T. 36).

In the decision, the ALJ acknowledged this testimony and cited to contradictory evidence including a progress note from plaintiff's, psychologist, Ellen Dougherty. In the July 2011 note, Ms. Dougherty states:

> His last employment was in March 2008 at Dunkin Donuts, where he left the job after an altercation with a coworker. Mr. Mashaw also reported a history of assaulting coworkers he had conflicts with but reported no history of arrests connected to this incidents [sic]. (T. 613).

The ALJ referenced this discrepancy in the decision and concluded, "[n]ot only do the claimant's inconsistencies and inaccuracies make arriving [at] a proper diagnosis difficulty [sic], they detract from the credibility of the claimant's allegations and testimony in this case". (T. 20). Plaintiff argues that the ALJ failed to explain how his termination for the altercation with a co-worker undermines his allegations that he is unable to work around other people. Indeed, plaintiff claims that even assuming that his testimony was inconsistent, the fact that he was involved in the altercation supports his claims of disability. The Court disagrees.

"One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *See* SSR 96 7p, 1996 WL 374186, at *5; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).  As discussed *supra*, the ALJ's credibility assessment is entitled to great deference if it is supported by substantial evidence.  Here, the ALJ highlighted inconsistencies between plaintiff's testimony and reports to his medical providers as documented in the medical records.  The ALJ clearly explained her reasoning for determining that plaintiff was not credible, with citations to the record.  *Nieves v. Colvin,* 2014 WL 1377582, at *14 (S.D.N.Y. 2014) (citing, *inter alia, Torres v. Colvin*, 2014 WL 241061 at *11 13 (S.D.N.Y. 2014) ("The ALJ did not believe [plaintiff's] testimony regarding his work history and specifically stated so in his decision".)).  "It is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Cross v. Astrue,* 2010 WL 2399379, at *9 (N.D.N.Y. 2010) (citing *Carroll v. Sec'y of Health and Human Servs*., 705 F.2d 638, 642 (2d Cir.1983) (citations omitted).  In this matter, substantial evidence supports the ALJ's findings with respect to plaintiff's work history and inconsistent statements.  Therefore, the Court must uphold that determination.  *Id*. (citations omitted).

**B.    Lapse in Medical Treatment**

Plaintiff argues that he the ALJ failed to acknowledge that his lack of medical treatment is due to his recent release from prison and that he is attempting to re-establish care with his providers at the VA.

The ALJ questioned plaintiff about his current treatment regimen:

> Q.    Are you on any medication for depression?
> A.    At this present time, no.  I'm still trying to get back in to see certain people in the VA and get everything reassigned to me.

*        *        *

> Q.    How come you stopped going to the VA?
> A.    Because I went to Jamesville.[5]

Plaintiff testified that he was released from Jamesville Penitentiary in June and that he is no longer on probation.[6] (T. 38). Plaintiff continued:

> Q.    All right. So now you, are you getting any kind of psychiatric treatment at the current time?
> A.    At this present time, no. Again I'm still trying to, my psychologist yes, the one who does not prescribe the meds, psychologist, she was out on maternity leave, so I'm waiting for her to come back.
> Q.    Okay.
> A.    My psychiatrist, I've had two phone calls in to and I haven't heard anything back, so whatever. I'm, I'm not in any groups anymore because obviously I was away. Waiting to go see my psychologist to see if, you know, if after a meeting or two with her we can decipher whether I want to go back into groups or not.

Plaintiff also testified that he received treatment for his mental impairments while he was in jail, once every week or every two weeks. Plaintiff stated that the medical staff at the jail would not continue his prescription for Topamax.[7] Plaintiff's counsel offered to obtain the medical records from the jail for the ALJ and the ALJ responded, "Yeah, All right".[8]

At the time of the hearing, plaintiff asserted that he had been unable to establish contact with his psychiatrist. However, he also testified that one month earlier, in September 2011, he had an appointment with a doctor to get braces for his knees.

---

[5] "Jamesville" refers to the Onondaga County Department of Correction located in Jamesville, New York. *See* http://www.ongov.net/correction/home.html (last visited July 2, 2014).

[6] The administrative hearing took place in October 2011.

[7] Topamax is an anti-convulsants used to treat partial seizures in adults. *Dorland's Illustrated Medical Dictionary*, 1417 (31st ed.2007).

[8] The administrative transcript does not contain any records from Jamesville Penitentiary.

An ALJ can make an adverse credibility determination based on an applicant's failure to follow a treatment regimen if the applicant does not have a good reason for the lapse, but the ALJ first must ascertain the applicant's reason for noncompliance. *See Craft v. Astrue*, 539 F.3d 668, 678 79 (7th Cir. 2008). In this case, plaintiff was released from prison four months prior to the hearing. During that time, he was able to establish contact with a doctor to obtain knee braces. However, plaintiff did not seek any mental treatment from any doctor and did not provide any specific information regarding his attempt to recontact the VA. Indeed, the record contradicts plaintiff's statements concerning his attempts to re-establish contact with the VA after his release in June 2011. On December 29, 2011, plaintiff's psychologist prepared a letter and addressed the correspondence, "To Whom It May Concern". Ms. Dougherty states that plaintiff was discharged from the VA in February 2011 due to his incarceration. She continues, "[h]e ultimately decided not to reengage in treatment after his incarceration, due to a variety of factors. However, when he began to feel distressed given a number of stressors in the winter of 2011, he did initiate contact." According to Ms. Dougherty, plaintiff reinitiated contact with his providers at the VA in December 2011 and was given an appointment for January 19, 2012 to restart his medication. Upon review of the entire record including plaintiff's hearing testimony, the Court finds that substantial evidence supports the ALJ's credibility determination in this regard. Moreover, the ALJ did not reference plaintiff's failure to re-establish contact with his physicians to negate other compelling evidence or as the sole reason for discrediting his testimony, but properly mentioned it as one of the factors used in analyzing plaintiff's credibility. *See Campbell v. Astrue*, 596 F.Supp.2d 446, 454 (D.Conn. 2009), *see also* SSR 96 7p, 1996 WL 374186, at *5 (a claimant's statements "may be less credible . . . if the medical reports or records show that the individual is not following the treatment prescribed . . . ). The ALJ found that plaintiff's lack of medication

and treatment for his mental impairments is not consistent with plaintiff's allegations of a disabling mental impairment.

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ applied the correct legal standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. Taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not entirely credible and the ALJ adequately specified the reasons for discrediting plaintiff's statements. The ALJ engaged in a detailed discussion of the relevant regulatory factors. The Court concludes that substantial evidence of record supports the ALJ's finding that plaintiff was not credible.

## III.    VOCATIONAL EXPERT

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. *Pratt v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable grids.[9] *Pratt,* 94 F.3d at 39. The grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience". *Rosa*, 168 F.3d at 79. Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)". *Id*. at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the

---

[9] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

grids.[10] *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert

that jobs exist in the economy which claimant can obtain and perform is required only when "a

claimant's nonexertional impairments significantly diminish his ability to work-over and above

any incapacity caused solely from exertional limitations-so that he is unable to perform the full

range of employment indicated by the medical vocational guidelines." *Id.* The use of the phrase

"significantly diminish" means the "additional loss of work capacity beyond a negligible one or,

in other words, one that so narrows a claimant's possible range of work as to deprive him of a

meaningful employment opportunity". *Id*. at 606. Under these circumstances, to satisfy his

burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or

other similar evidence) that jobs exist in the economy which claimant can obtain and perform."

*Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 604). Therefore, when considering nonexertional

impairments, the ALJ must first consider the question-whether the range of work the plaintiff

could perform was so significantly diminished as to require the introduction of vocational

testimony. *Samuels v. Barnhart*, 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the

regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical

limitations on his work capacity before using the grids).

     The ALJ should elicit testimony from the expert by posing hypothetical questions. If a

hypothetical question does not include all of a claimant's impairments, limitations and restrictions,

or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to

---

[10] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); *see also Rodriguez* , 1998 WL 150981, at * 10, n. 12.

support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F.Supp. 497, 503 (S.D.N.Y.1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir.1983).

Here, plaintiff claims that the RFC assessment is flawed based upon the ALJ's refusal to assign significant weight to Dr. Alao's opinion and the improper credibility determination. As discussed *supra*, the ALJ's RFC analysis was supported by substantial evidence. There is no support for plaintiff's contention that he suffered from additional impairments that were improperly omitted from the RFC. Plaintiff has not set forth any other argument with respect to the ALJ's assessment at step five of the sequential analysis. Thus, the Court concludes that the ALJ's decision is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED** and plaintiff's motion for judgment on the pleadings (Dkt. No. 11) be **DENIED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.


Dated:  July 10, 2014
      Albany,  New York

Christian F. Hummel
U.S. Magistrate Judge